IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, STATE OF CONNECTICUT, STATE OF FLORIDA, EX REL GLENN PRAGER, RICHARD BAUDIN, CARLOS DIAZ, PAT DIAZ | : : : : | CIVIL ACTION NO. 10-22411-Civ-Seitz/O'Sullivan |
| VS. | : | **FILED *IN CAMERA* AND UNDER SEAL** |
| FIRST COAST SERVICE OPTIONS 532 Riverside Avenue Jacksonville, Florida 32202 | : : | JURY TRIAL DEMANDED |
| and | | |
| SAFEGUARD SERVICES LLC 5400 Legacy Drive Plano, Texas 75024 Defendants | | |

## SECOND AMENDED COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER THE *QUI TAM* PROVISIONS OF THE FEDERAL FALSE CLAIMS ACT AND SIMILAR STATE PROVISIONS

## I.     INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America and individual states named herein against Defendant First Coast Service Options ("First Coast") for its conduct in submitting false claims to be presented under the federal Medicare, Medicaid and other federally-funded government health care programs (collectively "Government Health Care Programs"), as well as causing the filing of false claims with Government Health Care Programs.

2.      This is also an action to recover damages and civil penalties on behalf of the United States of America against Defendant Safeguard Services LLC ("Safeguard") for its conduct in submitting false claims to the Centers for Medicare and Medicaid Services ("CMS").

**EXHIBIT "1"**

In addition, it is also an action against Safeguard for retaliation it has taken against Relator Glenn Prager ("Relator Prager") with respect to complaints he has made against both First Coast and Safeguard.

3.       First Coast is the Medicare Administrative Contractor ("MAC") for Medicare Part A and Part B for Federal Jurisdiction Nine (9) which includes Puerto Rico, the U.S. Virgin Islands and Florida.  Previously it was the fiscal intermediary ("FI") and Medicare Carrier for Florida and the Medicare Part B Carrier for Connecticut.

4.       As a MAC and FI, First Coast's duties include the enrollment of health care providers in the Medicare system, the payment of Medicare claims and the administration of Medicare appeals.  Health care providers enrolled in the Medicare system also perform services for beneficiaries receiving Medicaid benefits.

5.       From 2005 to the present, First Coast has engaged in a pattern of intentional and or reckless disregard in the execution of fiduciary services for which it bills the United States government by: (a) providing Medicare billing numbers to health care providers who are ineligible for program participation for failure to meet state or federal qualifying requirements and or unremedied previous denials of program participation; (b) providing Medicare billing numbers to health care providers who had previously been declared ineligible for program participation for failure to meet state or federal qualifying requirements and/or unremedied previous denials of program participation, where First Coast had actual knowledge that the providers had previously been declared ineligible; (c) ignoring its own administrative records, as well as other notifications it received and continuing to provide Medicare billing numbers to health care providers ineligible for Government Health Program  participation due to their fraudulent activities; (d) failing to take any action to retrieve Medicare funds paid out to

2

ineligible providers; (e) either ignoring or deliberately disregarding readily available public information and other data to which it had access which would have rendered these ineligible providers unacceptable for participation in Government Health Care Programs; and (f) failing to perform required inspections and other fact finding that would have revealed the ineligibility of providers to bill Government Health Care Programs.

6.      Despite its intentional and/or reckless disregard in the execution of its aforementioned fiduciary duties, First Coast has continued to make claims for payment from the United States government as though its functions and duties had been executed as required by law.

7.      Further, due to its intentional and/or reckless disregard in the execution of its aforementioned fiduciary duties, First Coast has caused the submission of numerous false or fraudulent claims to Government Health Care Programs.

8.      Safeguard has been and is a Program Safeguard Contractor ("PSC") in various jurisdictions including Florida.  In February 2009, Safeguard was named the Zone Program Integrity Contractor ("ZPIC") for Zone 7 which includes Florida, Puerto Rico and the U.S. Virgin Islands.  In September 2010, Safeguard was also named the ZPIC for Zone 1 which consists of California, Hawaii, Nevada, Guam, American Samoa and the Northern Mariana Islands.

9.      As a PSC and now a ZPIC, Safeguard's duties include performing program integrity functions and combating and preventing fraud, waste and abuse in Medicare. With the consolidation into the ZPICs, those duties now include Medicare Parts A, B, Durable Medical Equipment ("DME"), Home Health and Hospice and the Medicare Medicaid Data Match Project.  ZPICs work closely with the MACs and receive referrals from the MACs.

ZPICs identify program vulnerabilities and incidents of potential fraud, investigate allegations of fraud, initiate appropriate administrative actions and refer cases to the Office of the Inspector General ("OIG"), where appropriate.

10.     Safeguard has submitted false and fraudulent claims for payment to the United States government on its own contracts by falsely billing the United States for individuals who did not perform services on Safeguard's contracts with CMS.

11.     Safeguard also has retaliated against Relator Prager for his speaking up about and filing a complaint against First Coast for First Coast's intentional disregard and fraudulent conduct, as well as raising questions regarding Safeguard's billing and other conduct with respect to its own contract with CMS.

## II.     JURISDICTION AND VENUE

12.     These claims arise under the *Qui Tam* provisions of the federal False Claims Act, 31 U.S.C. §3729, *et. seq.* ("FCA"). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 31 U.S.C. §3732 which specifically confer jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

13.     Personal jurisdiction and venue for this action are predicated on 31 U.S.C. §3732(a) which provides: "any action brought under §3730 may be brought in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant, can be found, resides, transacts business or in which any act proscribed by §3729 occurred." First Coast and Safeguard transact substantial business in the Southern District of Florida.

14.     This Court has supplemental jurisdiction over the claims brought pursuant to *qui tam* provisions of the Connecticut and Florida FCAs pursuant to 28 U.S.C. §1367 which provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are

4

so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution".

15.     Under the FCA, this Complaint is to be filed *in camera* and remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders. The government may elect to intervene and proceed with the action within 60 days after it receives both the Complaint and the material evidence and information.

## III.    PARTIES

16.     *Qui Tam* Plaintiffs Relator Prager, Richard Baudin ("Relator Baudin") Carlos Diaz ("Relator C. Diaz") and Pat Diaz ("Relator P. Diaz") (collectively "RELATORS") are citizens and residents of the state of Florida. RELATORS bring this action on behalf of the United States of America and the states named herein.

17.     During the relevant time period, RELATORS were employees of Safeguard.

18.     Commencing in June 2009, Relator Prager became the Project Manager for the MAC Enrollment Special Study which became the Task Order 4B Project ("TO4B"). TO4B was an extremely successful project in the Medicare Program for Federal Jurisdiction 9. It reduced Medicare Part A Part B fraud by over 50 percent in the first 12 months of the project. Relator Prager remained the TO4B manager until January 2011 when he was summarily removed as Project Manager, despite receiving the highest performance ratings from Safeguard and also highly favorable acknowledgements from CMS for his work on TO4B.

19.     Relators Baudin and C. Diaz were also assigned to and performed services for TO4B and until January 2011 reported to Relator Prager. Commencing in January 2011, Relators Baudin and C. Diaz began reporting to the Project Manager who replaced Relator Prager on TO4B.

20.     Relator P. Diaz is also an employee of Safeguard but is not assigned to TO4B.

21.     In April 2011, Relators Prager and Baudin ended their employment with Safeguard. Relators C Diaz and P. Diaz are still presently employed by Safeguard.

22.     As a result of their employment with Safeguard, RELATORS have first-hand knowledge of the business operations of Safeguard and the fraudulent billings submitted by Safeguard to CMS.

23.     Through Relator Prager's role as the Project Manager for TO4B and Relators Baudin, C. Diaz and P. Diaz's employment with Safeguard, the ZPIC for zone 7 which covers federal jurisdiction 9, RELATORS also have knowledge of the business operations of First Coast. Relator Prager, Baudin and C. Diaz have first-hand knowledge of First Coast's reckless and or intentional failure to take appropriate actions to insure that provider numbers are not issued to health care providers who are known to have previously committed acts of fraud or were otherwise ineligible for such provider numbers. Relators Prager, Baudin and C. Diaz also have first-hand knowledge that First Coast either recklessly and/or intentionally failed to take other necessary actions to retrieve inappropriate payments from health care providers who were ineligible to receive payments.

24.     RELATORS bring this action based on direct and independent knowledge. None of the actionable allegations set forth in this Complaint is based upon a public disclosure as set forth in 31 U.S.C. § 3730(e)(4). Notwithstanding same, RELATORS are an original source of the facts alleged in this Complaint. As a result of their employment, RELATORS have first-hand knowledge of the business operations of Safeguard and First Coast

6

and their intentional and/or reckless disregard and fraudulent conduct in connection with their duties and responsibilities under the ZPIC and MAC contracts.

25.     Simultaneously with the filing of the original Complaint, as required under the FCA, RELATORS provided to the Attorney General of the United States, the United States Attorney for the Southern District of Florida and the State Attorneys General for the states of Florida and Connecticut, a statement of all material evidence and information related to the Complaint. The disclosure statement supports the existence of false claims by First Coast. Subsequent to filing the original Complaint, RELATORS have provided substantial supplemental disclosures and evidence which further support the existence of false claims by First Coast and support the existence of false claims by Safeguard.

26.     Defendant First Coast is a privately-held corporation. It is incorporated under the laws of the state of Florida with its headquarters located in Jacksonville, Florida. It conducts business and or has offices in Florida, Puerto Rico, U.S. Virgin Islands, Connecticut, Georgia and California.

27.     At all times relevant hereto, First Coast acted through its agents and employees, and the acts of First Coast's agents and employees were within the scope of their agency and employment. The policies and practices alleged in this Complaint were, on information and belief, established and/or ratified at the highest corporate levels of First Coast.

28.     Defendant Safeguard is a Delaware limited liability company with a principal place of business in Plano, Texas. It is registered as a foreign limited liability company to transact business in Florida and maintains offices in Florida.

29.     At all times relevant hereto, Safeguard acted through its agents and employees, and the acts of Safeguard's agents and employees were within the scope of their

7

agency and employment.  The policies and practices alleged in this Complaint were, on

information and belief, established and/or ratified at the highest corporate levels of Safeguard.

## IV.    STATUTORY AND REGULATORY BACKGROUND

### A.    The False Claims Act

30.    The FCA imposes liability upon any person who (a) "knowingly presents

or causes to be presented [to the Government] a false or fraudulent claim for payment or

approval"; (b) "knowingly makes, uses, causes to be made or used, a false record or statement

material to a false or fraudulent claim" or (g) "knowingly makes, uses or causes to be made or

used a false record or statement material to an obligation to pay or transmit money or property

to the government or knowingly conceals or knowingly and improperly avoids or decreases an

obligation to pay or transmit money or property to the Government."  31 U.S.C. §

3729(a)(1)(A), (B), and (G).

31.    The FCA imposes liability not only for intentionally false or fraudulent

conduct but also where the conduct is merely "in reckless disregard of the truth or falsity of the

information."  31 U.S.C. § 3729(b)(1)(A)(iii).

32.    The FCA broadly defines a "claim" as one that includes "any request or

demand, whether under a contract or otherwise, for money or property...that...is made to a

contractor, grantee or other recipient, if the money or property is to be spent or used on the

Government's behalf or to advance a Government program or interest, if the United States

Government—(i) provides or has provided any portion of the money or property requested or

demanded; or (ii) will reimburse any portion of the money or property requested or demanded."

31 U.S.C. § 3729(b)(2)(A).

B.      **Government Health Care Programs**

33.      Medicare is a government financial health insurance program administered by the Social Security Administration of the United States. Medicare was promulgated to provide payment for medical services, durable medical equipment and other related health items for individuals 65 and over. Medicare also makes payment for certain health services provided to additional classes of certain individual healthcare patients pursuant to federal regulations.

34.      The federal government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide health care to low-income individuals. 42 U.S.C. §§ 1396-1396v. The Medicaid program pays for services pursuant to plans developed by the states and approved by the U.S. Department of Health and Human Services ("HHS") Secretary through CMS. States pay doctors, hospitals, pharmacies, and other providers and suppliers of medical items and services according to established rates. See 42 U.S.C. §§ 1396b(a)(l), 1903(a)(1). The federal government then pays each state a statutorily established share of "the total amount expended ... as medical assistance under the State plan ..." See 42 U.S.C. § 1396b(a)(l). This federal-to-state payment is known as federal financial participation ("FFP").

35.      In 2003, Congress passed the Medicare Prescription Drug, Improvement and Modernization Act ("MMA"). MMA was designed to achieve better medical management and more efficient processing by improving Medicare's administrative services to beneficiaries and health care providers. Under MMA, Congress directed CMS to expand competition beyond traditional health insurers for Medicare's claims payment business.

36.      Until 2006, CMS relied on various contractors, including FIs, to enroll health care providers in the Medicare program, process Medicare claims, educate health care

9

providers on Medicare billing requirements, handle claims appeals, answer beneficiary and provider inquiries and prevent and detect fraud and abuse.

37.     Until 2006, CMS' contractors included 25 FIs who processed fee-for-service ("FFS") claims for institutional providers under Parts A and B of the Medicare program, 18 carriers who processed FFS claims for professional providers under Part B of the Medicare program, four FIs who concentrated on home health claims and four Carriers who processed claims for durable medical equipment and supplies.

38.     In July 2006, following the goals set in the MMA, CMS began implementing a plan to modernize FFS claims processing.  CMS established 15 MAC jurisdictions and set about to award contracts to a single contractor in each jurisdiction to process both Medicare Part A and Part B claims.

39.     As of 2009, CMS had awarded a contract in each MAC jurisdiction.

40.     The Medicare Integrity Program was established in 1996 to strengthen CMS' ability to reduce fraud and abuse in the Medicare program.  In 1999, CMS began transferring responsibility for detecting and deterring fraud and abuse in Medicare Parts A and B from carrier and FI fraud units to PSCs.  By 2007, CMS had 18 benefit integrity task orders with PSCs.  Each task order covered a geographic jurisdiction.

41.     PSCs were tasked to identify and deter Medicare fraud and abuse, develop high quality fraud cases for referral to OIG, respond to requests for Medicare data and support from law enforcement, identify and report program vulnerabilities to CMS, refer recommendations to the appropriate entity for various corrective actions and develop and validate methodologies for the early detection and prevention of fraud schemes and abusive billing to the Medicare program.

{MI 269573 2}

42.    In 2008, CMS began consolidating the scope of PSCs and Medicare Prescription Drug Integrity Contractor contracts into ZPICs. The scope of the ZPICs' responsibilities mirror the scope of the PSC's responsibilities. CMS established seven jurisdictional zones for the ZPICs that were designed to align effectively with multiple MAC jurisdictions. To date only ZPIC contracts for zones 1, 2, 4, 5 and 7 have been awarded.

## V.    FACTUAL ALLEGATIONS

### A.    First Coast's Role as a FI and a MAC

43.    Prior to CMS' award of the MAC contracts, First Coast was the FI and Carrier for Florida. First Coast was also the Carrier for Connecticut.

44.    Acting as a FI and a Carrier, First Coast enrolled health care providers and processed claims under Parts A and B of the Medicare program.

45.    In 2008, First Coast was awarded the MAC contract for jurisdiction nine (9) which includes Florida, Puerto Rico and the Virgin Islands.

46.    As a MAC and previously as an FI, First Coast's principal responsibilities include the enrollment of health care providers in the Medicare system and the issuance of provider numbers to those health care providers eligible for participation in Government Health Care Programs, as well as the processing of claims submitted by health care providers for reimbursement for health care services rendered to the beneficiaries of Government Health Care Programs. Included within the provider enrollment function is the determination that the applicant is currently an approved provider of Government Health Care Program services and/or has met all criteria and requirements necessary to gain approved status as a provider.

47.    As a MAC and previously as an FI, First Coast has both fiduciary and contractual obligations to see that the Medicare/Medicaid funds paid out on claims that it processes go only to those eligible to receive them. During the period from 2005-2008, First

11

Coast processed billions of dollars in claims that were paid out to persons whose billing numbers should have been revoked, terminated or suspended. First Coast did so because it profits from each claim it processes, even those submitted by ineligible providers. As such, First Coast had a financial incentive to issue provider billing numbers and subsequently process claims, even where the applicant was ineligible or had a previously issued billing number that had been suspended or revoked.

**B.    The Enrollment Process**

48.    Every health care provider seeking to participate in a government health care program must apply by completing a form CMS-855.

49.    It is the responsibility of the MAC to "ensure that all required data elements have been furnished and are correct." Included in the MAC responsibilities are: processing all enrollment actions; deactivating or revoking providers; and reviewing all applications for completeness and documentation showing that the application includes all required supporting documents demonstrating that the provider type has been substantiated.

50.    Data required to be verified includes:

a.    Adverse legal history of provider and related entities;

b.    Practice locations and phone numbers;

c.    The credentials of every licensed health care provider for whom billing privileges are requested;

d.    Appropriate business licenses necessary to operate as a health care facility;

e.    Biological waste permits and other necessary medical related permits;

f.    Appropriate medical service provider type identification;

g.    Accurate corporate ownership and management information.

*See* Medicare Program Integrity Manual ("MPIM") Chapter 10, § 5.2.

51.     As a MAC, First Coast is required to confirm that the applicant, all individuals and entities listed on the application and any names or entities ascertained through the use of independent verification source, are not presently excluded from the Medicare program.   MACs must confirm and validate data through Qualifier.net, the Medicare Exclusion Database ("MED") and the General Services Administration ("GSA") debarment list. *Id.* at § 1.3.

52.     The MAC is also required to ensure the completeness and accuracy of each application and is obligated to deny applications not satisfying enrollment standards.

53.     In order to execute its responsibilities, First Coast is given access to and control of government information systems covering both provider enrollment and claims processing.  First Coast's duty to screen and verify the eligibility of provider applicants requires it to review and validate all application information and supporting documents.  It is obligated to review the license and certification requirements which apply to personnel delivering health care services.  It is also required to establish the *bona fides* of the location where those services are performed.

54.     First Coast has admitted that it has internal tracking systems which permit it to determine when a previously suspended provider moves to a new eligible provider in the Medicare system.  Despite having these internal tracking systems, First Coast has repeatedly deliberately failed to suspend or revoke previously suspended providers when they move to a new eligible provider facility.

55.     CMS requires the MAC to perform internal and external audits in support of program integrity.  These audits are critical to both program integrity and the quality of services provided.

13

56.     First Coast certifies to CMS that its processes, procedures and results are accurate, yet these certifications are false.  First Coast has recklessly and/or deliberately resisted taking those steps it knows to be necessary to assure accuracy.  Instead, First Coast has: (1) repeatedly granted billing privilege eligibility to providers with well-known prior histories of billing privilege suspension or revocation; (2) failed to take revocation action against providers who had been shown to First Coast as being noncompliant with Medicare enrollment requirements even though MACs have been granted authority by CMS to take revocation action without prior CMS approval; and (3) deliberately and repeatedly failed to verify basic enrollment information provided on the CMS application form 855.

57.     Because First Coast profits from the processing of claims submitted even by ineligible providers, First Coast is financially incentivized to intentionally ignore ineligibility criteria when issuing provider numbers.

**C.     First Coast's Disregard of Safeguard's Notices of Ineligibility**

58.     To assist the MAC's program integrity function, CMS created PSCs and more recently ZPICs.  The primary goal of the PSCs/ZPICs is to identify cases of suspected fraud, develop them thoroughly and in a timely manner and take immediate action to insure that Medicare Trust Fund monies are not inappropriately paid out and that any mistakenly paid monies are recouped.  Preventing and detecting potential fraud involves a cooperative effort among program participants, including the MACs and the PSCs/ZPICs.

59.     As an example of the cooperative effort between the MACs and the ZPICs, a provider enrollment special study has been designed and implemented in Florida involving First Coast and Safeguard.  This study was aimed at the detection of potential fraud through the referral of providers seeking to participate in Government Health Care Programs by First Coast to Safeguard, to make certain that only those eligible for participation are admitted

14

or remain in Government Health Care Programs. Following the referral, investigation of cases of potential fraud and abuse is undertaken and notification to both CMS and First Coast of Safeguard's findings is made. Those findings are to be acted upon by First Coast to revoke, terminate or suspend the participatory privileges of the offending provider.

60.     On numerous occasions, First Coast has knowingly disregarded documented information provided by Safeguard and CMS as to the ineligibility of providers to whom First Coast has issued provider numbers. These notices of ineligibility are based on a variety of factors including: (1) failure to meet state or federal standards of participation; (2) criminal convictions; and (3) well-established allegations of fraud against providers or entities whose claims were actually processed by First Coast and/or had received provider numbers from First Coast. In each instance, the billing number of that provider should have been immediately revoked by First Coast upon receipt of the information.

61.     First Coast prepares and scores a sheet known as the Fraud Level Indicator ("FLI") for every provider in TO4B. Providers scoring above the FLI threshold are submitted to Safeguard for an onsite inspection.

62.     The FLI details a provider's prior history of any administrative actions taken by CMS in addition to other fraud indicators. Despite having information of prior suspension and or revocation of billing numbers, First Coast has continued to issue provider numbers to ineligible providers. A simple cross-reference of the FLI with the provider enrollment application signals ineligibility. By failing to act against non-compliant providers through rejection or denial of applications, revocation of billing privileges or the implementation of prepay edits, First Coast has intentionally and/or recklessly failed its duty to the Medicare program to insure that only compliant providers maintain billing privileges.

63.     A recent example of First Coast's recklessness involved J.C. Lopez-Escobar MD. First Coast sent Safeguard an FLI on Dr. Lopez-Escobar which clearly identified three prior instances where Safeguard attempted to revoke groups connected to Dr. Lopez-Escobar. More significantly, RELATORS' review of the FLI materials revealed that in fact Dr. Lopez-Escobar should have never been initially approved. At the time of Dr. Lopez-Escobar's original application in 2007, in dereliction of its duty, First Coast failed to check the status of his professional license, which revealed professional discipline on the license. Dr. Lopez-Escobar's enrollment application form, however, failed to reveal the prior suspension. Hence the enrollment application contained a false representation and should have been denied in 2007. Instead , following 2007, Dr. Lopez-Escobar billed over $1.9 million to Medicare and was paid over $345,000 that should never have been billed or paid.

64.     An egregious case of First Coast's deliberate disregard of ineligibility is that of Abdon Borges, M.D., ME 81393 & ME 14277.

      a.     Abdon Borges, M.D. is a licensed physician in the state of Florida and an active Medicare provider. Dr. Borges currently has been assigned Medicare program billing privileges under PTAN # 90697.

      b.     Since 2005, Dr. Borges has been issued several different provider numbers by First Coast despite his ineligibility due to fraud and abuse including receiving payments for alleged injection services where no records were submitted.

      c.     Dr. Borges has been associated with several providers to whom he assigned his individual billing privileges.

            i.     Dr. Borges associated himself with Great Hope Medical Center LLC. Dr. Borges assigned his billing privileges to that group. Great Hope Medical's eligibility was suspended for fraud and abuse in May 2005. First Coast received notice of that suspension on May 5, 2005. On January 10, 2006, an overpayment of $7.8 million dollars was assessed. First Coast received notice of that

16

overpayment assessment. That overpayment has never been collected. PTAN # 90697B, April 25, 2005.

ii.   First Coast authorized the assignment of billing privileges for Abdon Borges to Century One Medical Center, Inc. That number was terminated at that location on January 17, 2009 due to evidence of fraudulent billing. PTAN # U4110Z, March 3, 2006 .

iii.   First Coast authorized the assignment of billing privileges for Abdon Borges to I & L Therapy Center Corp. That number was terminated at that location on May 23, 2009 due to evidence of fraudulent billing. PTAN # U4110Y, September 1, 2006.

iv.   Dr. Borges submitted an enrollment application for revalidation of his Medicare enrollment. In that application, Dr. Borges failed to disclose adverse legal actions as is required in all applications. Adverse action information included disclosure of exclusions, revocations or suspensions. First Coast allowed eligibility to Dr. Borges despite the fact that the revocation and exclusion information was readily available to First Coast. PTAN #90697, April 4, 2008.

v.   First Coast authorized a new provider number for Abdon Borges at Radiology & Therapy MED Inc. That number was terminated at that location on May 1, 2009. PTAN # 90697X, April 15, 2008.

vi.   First Coast authorized the assignment of billing privileges for Abdon Borges to Novales Medical Center, Inc. That number was terminated at that location on September 3, 2009. PTAN # U4110X, April 21, 2008.

d.   In each instance, Dr. Borges' prior history should have disqualified him or the entity with whom he associated from acquiring a provider billing number. This prior history information was readily available to, but intentionally ignored by, First Coast.

65.   There are numerous other examples of ineligible providers whose identities were made known to First Coast as being ineligible, but who nevertheless received

17

new provider numbers and continued to receive state and federal reimbursement.   Some but certainly not all of those ineligible providers include:

    a.    Rene Casanova, M.D. – billing privileges suspended on 4/21/06 based on a determination of fraudulent billing and abuse of billing privileges.  First Coast received notice of that suspension.  As of 4/30/10, Dr. Casanova has billed Government Health Care Programs over $1.3 million and been paid  at least $350,000 since the suspension.  The excess of billings over payments represents rejected claims.

    b.    Hugo Goldstraj, M.D. – billing privileges suspended on 5/23/08, due to fraud and abuse of billing privileges.  As of 4/30/10, Dr. Goldstraj has billed Government Health Care Programs over $2 million and has been paid over $350,000 since the suspension.  The excess of billings over payments represents rejected claims.

    c.    Louis Campilla, M.D. – billing privileges suspended on 1/6/04, due to fraud and abuse of billing privileges.  As of 4/30/10, Dr. Campbell has billed Government Health Care Programs over $7 million and has been paid over $1.7 million since the suspension.  The excess of billings over payments represents rejected claims.

    d.    Michael Key, M.D. - billing privileges suspended on 11/20/06, due to fraud and abuse of billing privileges involving permitting use of unlicensed providers to provide services to beneficiaries.  First Coast received notice of that suspension in 2006.   As of 4/30/10, Dr. Key has billed Government Health Care Programs over $11 million and has been paid over $3.3 million since the suspension.  The excess of billings over payments represents rejected claims.

    e.    Hector Labrada, M.D. – billing privileges suspended on 1/6/04, due to fraud and abuse of billing privileges.  As of 4/30/10, Dr. Labrada has billed Government Health Care Programs over $7 million and has been paid over $750,000 since the suspension.  The excess of billings over payments represents rejected claims.

    f.    Luis Mas, M.D. – billing privileges suspended on 10/25/07, due to fraud and abuse of billing privileges.  First Coast received notice of that suspension in 2007.  As of 4/30/10, Dr. Mas has billed Government Health Care Programs $65,125,000 and has been paid over $10,900,000 since the suspension.  The excess of billings over payments represents rejected claims.

      g.      Gabriel Sanchez, M.D. – billing privileges suspended in 2004 due to fraud and abuse of billing privileges. First Coast received notice of the suspension on October 14, 2005. As of 4/30/10, Dr. Sanchez has billed Government Health Care Programs over $22.2 million and has been paid over $3 million since the suspension. The excess of billings over payments represents rejected claims.

66.     In each instance, First Coast had direct knowledge of the suspended status of each provider based on both information it received from the PSC/ZPIC and/or based its own system edits. Despite that knowledge, it continued to issue new provider numbers to these ineligible health care providers. First Coast also recklessly failed to address the outstanding overpayment balances owed by these ineligible health care providers when it permitted them to return to the Medicare system.

67.     As part of its duties, on behalf of CMS, First Coast notifies a provider of any suspension or revocation. Despite issuing this notice, First Coast issued new provider numbers to those same providers. It then allowed claims to be processed on behalf of those same providers, while being paid for the processing of those claims.

### D.    First Coast's Intentional Disregard of Notice of Improper Delegation of Physician Function and Patient Safety Issues

68.     First Coast has also consistently failed to take action against providers regarding the use of subordinate practitioners. The use of subordinate practitioners such as physician assistants ("PAs") is a way that patient needs can be met despite the shortage of qualified physicians in medically underserved communities.

69.     Medical doctors are able to delegate certain functions to PAs, so long as that delegation takes place subject to required supervision. First Coast has failed to monitor supervision and worse, has failed to act when confronted with blatant evidence of disregard of the oversight requirement by the provider.

DM1 256573.2

70.    For example, in March, 2010, First Coast was advised by Safeguard that since sometime in 2008, Coral Reef Rehab, Inc. was improperly delegating the performance of various physician-type functions to a PA, Olga Lopez, absent proper physician supervision. Among the unsupervised functions performed by Ms. Lopez was the writing of prescriptions.

71.    Despite this notice, First Coast refused to take any action against Coral Reef Rehab.

72.    Since October, 2009, First Coast has been presented with 19 separate cases of inadequate supervision of PAs. On each occasion, First Coast received a written recommendation from Safeguard to revoke billing privilege of providers who were found to be utilizing PAs improperly. In each instance and following direct communication to First Coast of the facts evidencing the systematic violations, First Coast refused to act.

**E.     The Failure of First Coast to Verify Data**

73.    First Coast routinely recklessly disregards its obligation to pre-screen and monitor basic program requirements.

74.    First Coast's failure to screen program enrollment applications is not limited to individual providers. Each provider type must also meet state and federal program standards for participation. First Coast has routinely ignored these basic standards and issued provider numbers despite their glaring absence or abuse.

75.    First Coast has issued provider numbers to: (1) business found operating without proper business licenses to operate; (2) providers who have failed to disclose accurate information on corporate ownership and management; (3) applicants who have falsely provided the locations of practices; (4) applicants who have falsely stated the nature of the service being provided; and (5) providers who have certified false statements in enrollment applications.

76.     Each of these discrepancies could have easily been ascertained if First Coast had properly performed its pre-screening duties as required in its MAC contract.

77.     Despite being made aware of these failures, First Coast has continued to process and get paid for processing the claims of these ineligible providers.

78.     G & J Medical Rehab Center, Inc., ("G&J Medical") is an example where First Coast has failed to verify application data. G&J Medical is a comprehensive outpatient rehabilitation facility ("CORF") operating in Miami-Dade County, Florida. It has been permitted to participate in Government Health Care Programs despite not having the necessary permits for the handling of biomedical waste.

79.     The enrollment documentation collected and processed by First Coast did not contain the necessary biomedical waste permit. First Coast approved G&J Medical's application despite the readily apparent absence of the permit.

80.     During 2009, G&J was wrongfully paid more than $690,000 from the Medicare trust fund due to First Coast's failure to deny G&J Medical's application.

81.     CORFs are enrolled by Medicare to provide physical therapy and other outpatient services. In recent inspections which occurred during the period from July 2009 to June 2010, of 48 CORF facilities previously enrolled by First Coast, 90% were found not to be providing at least one of the required services critical to their patient populations, including such fundamental CORF services as physician and social services.

82.     First Coast was notified of these inspection results at the conclusion of each inspection through written reports demonstrating noncompliance by these providers and recommendations for revocation of billing privileges. The inspection results revealed

21

unequivocally that these providers should never have been issued provider numbers as CORFs since they were never operating as CORFs.

83.     Between July 2009 and June 2010, sixteen Community Mental Health Centers ("CMHCs") have been reviewed in the area of Miami-Dade, Broward and Palm Beach Counties. Of those sixteen CMHC facilities, twelve have been found not to be providing critical core functions, such as transfer evaluations for appropriate placement in state mental health facilities or outpatient mental health therapy to children.

84.     CMHCs must provide the following core services:  outpatient services including specialized services for children, the elderly, individuals who are chronically mentally ill and residents of the CMHC's service area who have been discharged from inpatient treatment at a mental health facility; 24 hour-a-day emergency services; day treatment or other partial hospitalization services or psychosocial rehabilitation services; and screening for patients being considered for admission to state mental health facilities.

85.     Genesis Community Health Center, Inc. ("Genesis") is a CMHC located in Miami-Dade County, Florida. First Coast approved Genesis as a CMHC and continued to process claims submitted by Genesis despite knowing of Genesis' failure to provide the required outpatient services to the required populations.

86.     During the period from April 2, 2009 to March 13, 2010, Genesis was paid over $960,000 in Medicare funds for providing group psychotherapy in a partial hospitalization setting (CPT Code G0410).  Genesis never met the core services requirements of a CMHC and hence should not have been permitted to bill for these services.

87.     In February, 2010, First Coast allowed Miami Behavioral Health Center, Inc., a CMHC, to bill from a second location, despite being advised that the facility at the

22

location was an Assisted Living Facility and was unable to provide and/or bill for out-patient psychiatric services. First Coast was advised of the ineligibility but permitted billing to occur.

88.     Green Cross, Inc., a large CMHC operating in both Broward and Miami-Dade counties, has repeatedly submitted inaccurate and incomplete enrollment documentation to First Coast in order to secure billing privileges. First Coast has routinely processed these applications despite having numerous grounds to reject, deny or revoke eligibility. Robert Petty of First Coast had specific knowledge of the deficiencies in Green Cross' applications, yet First Coast continues to process Green Cross' applications.

F.     **Based On Information Supplied by First Coast, First Coast's Former Employee and Subcontractor Has Alerted Providers to Upcoming On-Site Inspections**

89.     A critical element of the PSC/ZPIC review is an unannounced facility inspection. Any forewarning of an inspection to be conducted by a PSC/ZPIC undermines the value of the inspection as a means to measure and assess provider compliance.

90.     A First Coast former employee and current First Coast subcontractor, Larry Reynolds ("Reynolds"), has repeatedly tipped off providers of upcoming Safeguard inspections based on information provided by First Coast as to upcoming inspections. These tip-offs continue to the present despite false assurances by First Coast that Reynolds was performing only drive-by verifications and not entering any provider facilities.

91.     Reynolds has told providers for whom Safeguard inspections were planned not only of the existence of the upcoming inspection but also coached providers in the preparation of medical files that would be later provided to Safeguard inspectors. Reynolds has also assisted providers to prepare folders with documents which are known would be requested by the Safeguard field inspection team. In addition at least two providers have reported that

23

Reynolds was accompanied by Karen L. Young-Wilenbrecht ("Young-Wilenbrecht"), another former First Coast employee and presently a private Medicare consultant to providers.

92.     Providers have informed Safeguard inspectors that Reynolds had been in their offices prior to the so called unannounced inspection and advised them as to what would be needed during the inspection. In one instance, at the time of the "unannounced inspection" the provider handed the Safeguard inspectors five beneficiary folders that had been prepared before the investigator even asked for any files. The provider noted that he knew Safeguard was coming because he had been so advised by Reynolds.

93.     In March 2010, Safeguard arrived unannounced at Associated Radiology Diagnostics, Inc. The office manager advised that Reynolds had visited the facility a few weeks before during which he reviewed files, inspected licenses and permits. The manager handed the Safeguard inspectors ten prepared medical files that Reynolds had reviewed.

94.     Again in March 2010, Safeguard inspectors arrived at New City Medical Center. They were told by the receptionist that "we were expecting you" because Reynolds had been there only a few weeks before.

95.     In April 2010, the office manager of CT Imaging told the Safeguard inspectors that Reynolds had been there a few weeks before and advised that an onsite inspection was coming.

96.     Other providers who have admitted to the Safeguard team that they had been tipped off by Reynolds include: Orthopedic Innovators, Inc., Felcas Health Center, Inc., Oracle Diagnostic Laboratories, Onsite Rehabilitation, Villa Maria Rehabilitation, ALFE Ultrasound & Radiology Services and Green Cross.

DM1 2565732

97.     Reynolds is well known in the South Florida provider community. Relators Prager and Baudin have been informed that Reynold's mere visit to a provider's facility is a signal that an "unannounced" inspection is imminent.

98.     Reynolds has also provided assistance to an independent diagnostic testing facility provider.  This assistance included guidance as how to set up equipment logs and tracking mechanisms for diagnostic equipment.

99.     After advising CMS of the problem with Reynolds tipping off providers, Relator Prager was informed by First Coast that in the future, Reynolds would simply perform a drive-by of the facility but not enter the premises.  Since that time, Safeguard's inspection teams have frequently been apprised that Reynolds has continued to visit various facilities which were assigned to Safeguard to perform an unannounced on-site inspection.

100.    At a Safeguard inspection in early March 2011 for Physical Therapy Services, Inc., the owner/provider confirmed that Reynolds and Young-Wilenbrecht had visited his site in late December 2010, entered the premises and spoke to the owner/provider.  Despite being told by CMS to limit site verifications to drive-by inspections, Reynolds, a First Coast subcontractor and Young-Wilenbrecht continue to enter provider facilities and tip-off the provider to the upcoming Safeguard inspection.

**G.    First Coast Has Caused the Submission of False Claims and Records**

101.    The management of First Coast is well aware of its failure to determine eligibility of persons or entities to whom it issues provider numbers.

102.    In 2006, prompted by the disproportionate amount of Medicare fraud and abuse in the South Florida region, CMS required First Coast to do an internal review of its eligibility determinations.  That review revealed that:

25

a. On those rare occasions where on-site inspections of provider facilities ever took place, those inspections were conducted after the Medicare provider number was issued; and

b. Field activity checks by First Coast were conducted at provider facilities where First Coast had direct knowledge of prior investigations by the PSC of those same provider facilities and for which the PSC had previously recommended administrative action against those providers.

103. In a 2009 effort to address rampant provider fraud in the South Florida region, CMS charged First Coast to work in conjunction with Safeguard on provider enrollment compliance. That effort revealed:

a. Of 354 health care providers in Miami-Dade, Broward and Palm Beach Counties, 226 were found to be ineligible. The ineligible providers consisted of:

   i. 3 Ambulance transportation companies;

   ii. 12 CMHCs;

   iii. 43 CORFs;

   iv. 12 individual practitioners;

   v. 2 clinical laboratories;

   vi. 8 independent diagnostic testing facilities;

   vii. 34 outpatient physical therapy centers; and

   viii. 112 group clinics.

The reasons cited for the ineligibility for these providers ranged from those capable of remediation to many that were irremediable. In almost every case, simple pre-screening of enrollment applications by First Coast would have precluded eligibility until the CMS requirements were achieved.

104. On information and belief, First Coast has failed to take action to retrieve funds paid on claims that it knew to be improperly paid to these ineligible providers.

26

105.   First Coast has also repeatedly failed to keep or maintain ineligible or potentially ineligible providers on prepay edits. Safeguard has often discovered that providers who were placed on prepay edits have repeatedly been paid for claims submitted when they were supposedly placed on prepay edit. In many instances, First Coast attempts to blame the prepay edit problem on some type of software glitch but First Coast habitually ignores its duty to solve the software problem.

106.   In 2010, the following providers who were on prepay edits were nonetheless paid claims as follows:

    a.   Alpha Health Care Clinic: billed $53,600; paid $22,637

    b.   Hope Horizon Center, Inc.: billed $37,760; paid $19,888

    c.   Healing Minds: billed $14,000; paid $5,800

    d.   Renascence CMHC: billed $850,000; paid $358,322

    e.   R&S CHMC: billed $251,600; paid $106,018

    f.   Meapris CHMC: billed $6,525; paid $1,149

    g.   Miracle Mile CHMC: billed $2000; paid $824

    h.   The Ritz CHMC: billed $2,475; paid $1,313

    i.   St. Theresa: billed $240,000; paid $101,053

    j.   Palmetto Associates: billed $243,400; paid $163,638

    k.   Keter Behavioral: billed $243,900; paid $137,031

    l.   New Day: billed $115,200; paid $64,723

107.   Hence at a minimum, in 2010, First Coast's repeated intentional refusal to address its so-called software glitch has cost the Medicare trust fund nearly one million dollars.

DM1 2565732

108.   From 2006 to the present, First Coast has also failed to enforce prepay edits and paid out untold claims that should never have been paid.

109.   From 2006 to the present, First Coast has resisted taking actions necessary to prevent the issuance of provider numbers to ineligible persons by failing to meaningfully pre-screen program applicants, verify application information, and/or provide the monitoring of provider activity necessary to maintain compliance with program conditions of compliance.

110.   First Coast's failure to take actions necessary to prevent the enrollment of ineligible providers and processing of inappropriate or fraudulent claims is caused by its unwillingness to absorb any diminution of revenue caused by the elimination of fraudulent claims or ineligible providers.

111.   This pattern of successive issuance of provider numbers to ineligible providers is a result of reckless and/or intentional disregard of information available to the general public, as well as data bases to which First Coast and every other MAC has immediate access.

112.   First Coast has embarked upon this course of wrongful conduct knowing it would lead to the submission of a myriad of false claims to Government Health Care Programs.

113.   Medicare does not incentivize First Coast to identify and suspend ineligible health care service providers. Rather, the converse is true. CMS pays First Coast close to One Hundred Million Dollars each year for performance of its administrative duties, plus an additional sum for each claim it processes. Included in those claims processed by First Coast, for which it is paid by Medicare, are claims later determined to be invalid. As a result of

this financial incentive. First Coast continues to recklessly disregard clear and unequivocal evidence of ineligible providers and continues to be compensated for the processing of the claims for payment made by those same ineligible providers.

**H.**   **Safeguard Has Submitted False Claims By Billing CMS For Individuals Not Performing Services On Safeguard's Contracts With CMS**

114.   Safeguard's contract with CMS is a cost plus contract so that CMS pays for the services of Safeguard employees who work on the various Safeguard contracts with CMS.

115.   Relators Prager and Baudin have reviewed the monthly time records for TO4B for the months of August, September, November and December 2010. In August 2010, 65 individuals billed time to TO4B. Twenty-two of those individuals, comprising a total of 124 billed hours, had not performed any work on TO4B. In September, 2010, 62 individuals billed to TO4B. Again 22 of those individuals did not perform work on TO4B but billed in excess of 111 hours to TO4B. Similarly, in November 2010, 65 individuals billed to TO4B. Twenty-two of those individuals did not perform services on TO4B, but yet billed in excess of 161 hours to TO4B. In December 2010, 65 individuals billed to TO4B. Twenty-two of those individuals did not perform services on TO4B. Those 22 individuals billed in excess of 188 hours to TO4B. *See* Billing records attached hereto as Exhibit "A", names highlighted in yellow are those employees not performing services on TO4B.

116.   In just four months, in excess of 585 hours have been charged to CMS by individuals not performing services on the specified contract.

117.   Review of time records for other Safeguard contracts with CMS reveals similar discrepancies regarding individuals actually performing services on the contracts and those billing time to the contracts.

29

118.    Safeguard has submitted false claims to CMS by seeking payment under its contracts with CMS for individuals not performing services on the contracts.

**I.    Safeguard Has Retaliated Against Relator Prager For His Complaints Against First Coast Regarding First Coast's Submission Of False Claims To CMS And For His Complaints Challenging Safeguard's Conduct Regarding Its Contract with CMS**

119.    Commencing in mid 2010, Relator Prager began experiencing push back and later retaliation when he spoke out about First Coast's intentional failure to comply with its obligations under its contracts with CMS.

120.    Relator Prager is aware of a very close relationship between individuals in the Miami field office of CMS and officers of First Coast as relayed to him by First Coast employees and CMS personnel.  When Relator Prager raised issues regarding First Coast to the CMS Miami field office, he was repeatedly rebuked and advised that the problems did not exist, that he was overstating issues or that he did not understand the regulations.

121.    TO4B was originally administered by the central office of CMS in Baltimore, Maryland.  In mid 2010, the Miami field office of CMS sought to have the administration of TO4B be conducted through the Miami field office rather than Baltimore. The contract manager from Baltimore, Elizabeth Mathews was replaced by Rose Murphy of CMS' Miami field office.  Rose Murphy is known to have a close relationship with Robert Petty of First Coast.

122.    Prior to Rose Murphy taking over the administration of TO4B, Safeguard submitted approximately 140 revocation requests to CMS and 121 or approximately 85% of those revocation requests were approved.  After Rose Murphy took over the administration of TO4B, Safeguard submitted 129 revocation requests but only 36 or 28% have been approved.

30

123.    Relator Prager was advised by Safeguard management that Safeguard did not want to risk losing its contracts with CMS and that Safeguard would not support Relator Prager in his complaints concerning First Coast and its wrongful conduct.

124.    Safeguard repeatedly closed its eyes to and acquiesced in First Coast's intentional failure to perform its duties and responsibilities to CMS as summarized above in paragraph 4.

125.    Commencing from the start of his employment at Safeguard until late December 2010, Relator Prager had received only glowing reviews and performance bonuses.

126.    At his first review in December 2009, Relator Prager received an Exceed Expectation rating and was told it was the highest rating of all Safeguard project managers.

127.    In July 2010, Relator Prager received a glowing review from CMS with respect to the work he performed on a home health care project.  At the time, he was told that this rating from CMS was the highest rating that Safeguard had ever received from CMS.  CMS noted in its review that Relator Prager "demonstrated effective leadership, coordination and a commitment to finding the best approaches to effect results.  He established good working relationships with partners and laid the groundwork for processes that were to become best practices."

128.    The president of Safeguard informed Relator Prager that Safeguard recognized the millions of dollars of new business that Relator Prager had generated for Safeguard as a result of the Whitepapers he had written for CMS.

129.    Relator Prager received performance bonuses from Safeguard in October 2009 ($5200); November 2009 ($3644); December 2009 ($2521); May 2010 ($3100); and June 2010 ($6000).

130.    Since the filing of the *Qui Tam* Complaint, Relator Prager has not received any bonuses. More significantly, since the filing of the *Qui Tam* Complaint, Relator Prager has been harassed and then demoted, suffering humiliation in the eyes of his peers and co-workers.

131.    In December 2010, after filing the *Qui Tam* Complaint, Relator Prager received a P rating which precluded his eligibility for any bonus.

132.    In December 2010, Rose Murphy of the CMS Miami field office called Relator Prager a liar during a meeting when he noted that due to a delay in a decision by the Miami field office in approving revocations and the Miami field office's decision not to require First Coast to place certain providers on prepay edits, an indicted provider had been paid during the months leading up to his indictment for fraud. In addition, Relator Prager noted that other providers had been paid that would not have been paid had First Coast placed those providers on prepay edit. Due to Rose Murphy's unfair accusation, Relator Prager agreed to provide the back-up documentation, including e-mails and meeting minutes for his statements.

133.    Relator Prager pulled e-mails and meeting minutes showing the decisions and lack of action by the Miami field office and provided the materials to his Safeguard superiors to send to the CMS Miami field office. Safeguard did not submit the documentation and explanation provided by Relator Prager to the Miami field office.

134.    A day later when the Miami field office asked for the back-up, Relator Prager's superior had another Safeguard employee re-write what the Relator Prager had provided.

135.    Several days later on December 14, Relator Prager was informed that based on a complaint from Rose Murphy, he was being removed as the TO4B manager and

DM1:259573.2

placed on a different project effective January 4, 2011. Safeguard management advised that it was not due to performance issues but solely due to irreconcilable differences between Relator Prager and Rose Murphy. Relator Prager's project team was told of his removal. Safeguard management informed the project team members that Safeguard risked losing TO4B if Relator Prager remained the manager of TO4B.

136.    Relator Prager has been advised that Rose Murphy had effectuated his removal from TO4B.

137.    Safeguard willingly capitulated to Rose Murphy's demands and did nothing to defend Relator Prager or the work he had done on the TO4B.

138.    The harassment of Relator Prager continued. In late January 2011, at a meeting of Safeguard ZPIC managers, Relator Prager's supervisor, Barbara Atlas ("Atlas") explained that the projected budget for TO4B was over budget by $500,000 and that Safeguard intended to eliminate certain employee positions from the project.

139.    Relator Prager questioned whether Safeguard could terminate positions that had been identified in the CMS proposal and reduce the staff working on TO4B without informing CMS. Atlas challenged Relator Prager for voicing his concerns in the meeting. Thereafter Atlas filed a complaint with Human Relations ("HR") against Relator Prager based on his voicing his concerns in a group meeting.

140.    A day after filing the complaint with HR, Atlas called Relator Prager to a meeting and had a witness present. Atlas informed Relator Prager that she did not trust being alone with him. After challenging Relator Prager's integrity and raising other issues, Atlas informed Relator Prager that she was advising HR that she was no longer comfortable working

33

with him. In April 2011, due to the continuing harassment, Relator had no choice but to leave his employment with Safeguard.

## COUNT I

### VIOLATION OF THE FALSE CLAIMS ACT
### AGAINST FIRST COAST

141.    RELATORS repeat and reallege paragraphs 1 - 140 of this Complaint as if fully set forth herein.

142.    From at least 2005 until the present, First Coast, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent claims to be paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(A) through its requests for payments and/or certifications submitted under its MAC contract and/or its approval of providers and processing of providers' claims whom it knew or recklessly and/or deliberately disregarded information concerning their ineligibility.

143.    From at least 2005 until the present, First Coast, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent records or statements material to a false or fraudulent claim to be paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(B) through its requests for payments and or certifications submitted under its MAC contract and/or its approval of providers and processing of providers' claims whom it knew or recklessly and/or deliberately disregarded information concerning their ineligibility.

144.    From at least 2005 until the present, First Coast, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent records or statements material to a false or fraudulent claim to

34

be paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(G) through its requests for payments and/or certifications submitted under its MAC contract and/or its approval of providers and processing of providers' claims whom it knew or recklessly and/or deliberately disregarded information concerning their ineligibility.

145. The United States and state Medicaid programs were unaware of the falsity of the records, statements and claims made by First Coast and as a result thereby have paid and continue to pay Government Health Care Programs' reimbursement that they would not otherwise have paid.

146. The United States and state Medicaid programs have been damaged by the payment of false and fraudulent claims.

WHEREFORE, RELATORS respectfully request this Court to award the following damages to the following parties and against First Coast:

To the United States:

(1) Three times the amount of actual damages which the United States has sustained as a result of Defendant's conduct;
(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the United States;
(3) Prejudgment interest; and
(4) All costs incurred in bringing this action.

To RELATORS:

(1) The maximum amount allowed pursuant to § 3740(d) of the FCA and/or any other applicable provision of law;
(2) Reimbursement for reasonable expenses which RELATORS incurred in connection with this action;
(3) An award of reasonable attorney's fees and costs; and
(4) Such further relief as this Court deems equitable and just.

DM1 2565873 2

## COUNT II

## VIOLATION OF THE FALSE CLAIMS ACT AGAINST SAFEGUARD

147.    RELATORS repeat and reallege paragraphs 1 - 140 of this Complaint as if fully set forth herein.

148.    From at least 2009 until the present, Safeguard, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent claims to be paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(A) through its requests for payments and/or certifications submitted under its PSC ZPIC contract.

149.    From at least 2009 until the present, Safeguard, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent records or statements material to a false or fraudulent claim  to be paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(B) through its requests for payments and/or certifications submitted under its PSC/ZPIC contract.

150.    From at least 2009 until the present, Safeguard, in reckless disregard or deliberate ignorance of the truth or falsity of the information it conveyed, presented or caused to be presented false or fraudulent records or statements material to a false or fraudulent claim  to be paid or approved by the Government in violation of 31 U.S.C. § 3729(a)(1)(G) through its requests for payments and or certifications submitted under its PSC/ZPIC contract.

151.    The United States was unaware of the falsity of the records, statements and claims made by Safeguard and as a result thereby has paid and continues to pay Safeguard reimbursement that it would not otherwise have paid.

152.    The United States has been damaged by the payment of false and fraudulent claims.

36

DM1 2565731 2

WHEREFORE, RELATORS respectfully request this Court to award the

following damages to the following parties and against Safeguard

To the United States:

    (1)    Three times the amount of actual damages which the United States has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the United States;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To RELATORS:

    (1)    The maximum amount allowed pursuant to § 3740(d) of the FCA and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which RELATORS incurred in connection with this action;

    (3)    An award of reasonable attorney's fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

## COUNT III

### RETALIATION AND VIOLATION OF 31 U.S.C. § 3730(H) RELATOR PRAGER VS. SAFEGUARD

153.    Relator Prager repeats and realleges paragraphs 1 – 140 of this Complaint as if fully set forth herein.

154.    At all times material hereto, Safeguard was an employer covered by 31 U.S.C. § 3730(h). Section 3730(h) precludes discharge, demotion or retaliation against employees who investigate, provide testimony or assistance in any action filed or to be filed under the FCA, 31 U.S.C. § 3729.

155.    Relator Prager's demotion, retaliation and constructive discharge as set forth above was in violation of 31 U.S.C. § 3730(h).

156.    As a direct and proximate result of the retaliation and harassment by Safeguard, Relator Prager suffered and incurred and continues to suffer and incur loss of past

and future earnings; compensation and other benefits and monies; harm and damage to Relator Prager's professional reputation and credibility by being wrongfully demoted in violation of public policy and with the false implication and statements to employees, prospective employers and others in the community that Relator Prager was demoted for reasons unrelated to the aforementioned refusal to acquiesce in and the potential to disclose, First Coast's and Safeguard's illegal and fraudulent conduct as set forth herein.

157.   Safeguard's conduct was malicious, fraudulent and oppressive and in violation of public policy and a violation of 31 U.S.C. §3730(h).

WHEREFORE, Relator Prager requests that judgment be entered against Safeguard in his favor and that he be awarded any and all relief pursuant to 31 U.S.C. §3730(h) including, but not limited to:

      a.    Two times the amount of back pay;

      b.    Interest on back pay;

      c.    Any and all other compensatory and special damages;

      d.    All litigation and reasonable attorney's fees;

      e.    Punitive damages; and

      f.    Any such further relief that this Court deems appropriate.

### COUNT IV

### FLORIDA FALSE CLAIMS ACT

158.   RELATORS repeat and reallege each allegation contained in paragraphs 1 - 140 above as if fully set forth herein.

159.   This is a *qui tam* action brought by RELATORS on behalf of the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

160.    Fla. Stat. § 68.082(2) provides liability for any person who-

    (a)    knowingly presents or causes to be presented to an officer or employee of an agency a false or fraudulent claim for payment or approval;

    (b)    knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by an agency;

    (g)    knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to an agency.

161.    First Coast violated Fla. Stat. § 68.082(2) and knowingly caused false claims to be made, used and presented to the State of Florida by its deliberate and systematic violation of federal and state laws, including the FCA and by virtue of the fact that none of the claims submitted in connection with its conduct were even eligible for reimbursement by Government Health Care Programs.

162.    The State of Florida, by and through the Florida Medicaid program and other state healthcare programs, was unaware of Defendant's conduct and paid the claims submitted by healthcare providers and third party payers in connection therewith.

163.    Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Florida in connection with First Coast's conduct.  Compliance with applicable Florida statutes, regulations was also an express condition of payment of claims submitted to the State of Florida.

164.    Had the State of Florida known that false representations were made by First Coast, it would not have paid the claims submitted by healthcare providers in connection with that conduct.

165.    As a result of First Coast's violation of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of millions of dollars exclusive of interest.

166.    RELATORS have direct and independent knowledge of the allegations of this Complaint and have brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of himself and the State of Florida.

WHEREFORE, RELATORS respectfully request this Court to award the following damages to the following parties and against First Coast:

To the State of Florida:

(1)    Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant's conduct;

(2)    A civil penalty of not less than $5,500 and not more than $ 11,000 for each false claim which Defendant caused to be presented to the State of Florida;

(3)    Prejudgment interest; and

(4)    All costs incurred in bringing this action.

To RELATORS:

(1)    The maximum amount allowed pursuant to Fla. Stat. § 68.085 and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which RELATORS incurred in connection with this action,

(3)    An award of reasonable attorney's fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT V

## CONNECTICUT MEDICAL ASSISTANCE PROGRAMS FALSE CLAIMS ACT

167.    RELATORS repeat and reallege each allegation contained in paragraphs 1- 140 above as if fully set forth herein.

168.    This is a *qui tam* action brought by RELATORS and the State of Connecticut to recover treble damages and civil penalties under the Connecticut Medical Assistance Program False Claims Act, § 17b-301a *et. seq.* (the "Act").

169.   The Act provides liability for any person who (1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval under the medical assistance programs administered by the Department of Social Services; or (2) knowingly makes, uses or causes to be made or used a false record or statement to secure the payment or approval by the state of a false or fraudulent claim under medical assistance programs administered by the Department of Social Services.

170.   First Coast violated Conn. Code § 17b-301b by engaging in the illegal conduct described herein and by virtue of the fact that none of the claims submitted in connection with its illegal conduct were even eligible for reimbursement by the Government Health Care Programs.

171.   Connecticut, by and through the Connecticut Medicaid program and other state healthcare programs, was unaware of First Coast's illegal conduct and paid the claims submitted by healthcare providers in connection therewith.

172.   Compliance with applicable Medicare, Medicaid and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to Connecticut in connection with First Coast's illegal conduct.  Compliance with applicable Connecticut statutes and regulations was also an express condition for payment of claims submitted to Connecticut.

173.   Had the State of Connecticut known that false representations were made by First Coast, it would not have paid the claims submitted by healthcare providers in connection with that conduct.

174.   As a result of First Coast's violation of Conn. Code § 17b-301b, Connecticut has been damaged in an amount far in excess of millions of dollars exclusive of interest.

175.   RELATORS have direct and independent knowledge of the allegations of this Complaint and has brought this action pursuant to Connecticut Code § 17b-301d on behalf of himself and the State of Connecticut.

WHEREFORE, RELATORS respectfully request this Court to award the following damages to the following parties and against First Coast:

To Connecticut:

(1)   Three times the amount of actual damages which Connecticut has sustained as a result of Defendant's illegal conduct;

(2)   A civil penalty of not less than $5,000 and not more than $10,000 for each false claim which Defendant caused to be presented to Connecticut;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To RELATORS:

(1)   The maximum amount allowed pursuant to Conn. Code § 17b-301e and or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which incurred in connection with this action;

(3)   An award of reasonable attorney's fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

Respectfully submitted,

DUANE MORRIS LLP

By: _____
Harvey W. Gurland, Jr., P.A.
Florida Bar No. 284033
Hwgurland@duanemorris.com

42

200 South Biscayne Boulevard
Suite 3400
Miami, FL  33131-2318
(305) 960-2214
(305) 397-1874 (fax)

Michael M. Mustokoff, Esquire
Teresa N. Cavenagh, Esquire
(admitted pro hac vice)
30 South 17th Street
Philadelphia, PA  19103
(215) 979-1808

Gary M. Farmer, Jr., Esquire
Florida Bar No. 914444
gary@pathtojustice.com
Brad Edwards, Esquire
Florida Bar No. 542075
Farmer, Jaffe, Weissing, Edwards, Fistos &
Lehrman, P.L.
425 N. Andrews Avenue, Suite 2
Fort Lauderdale, FL 3330

Attorneys for Plaintiffs/Relators